## J. T. FOREMAN V. THE STATE.

### *No. 412.    Decided April 28.*

1. **Murder—Continuance—Communicated Threats.**—On a trial for murder, it is not error to overrule an application for a continuance for absent witnesses to prove communicated threats, where it appears that one of the proposed witnesses was present at the trial and was not called by defendant to testify, and where the threats made by deceased were proved by other witnesses.

2. **Same—Mutual Combat—Self-Defense.**—On a trial for murder, evidence of communicated threats can have no bearing favorable to the defendant where the evidence clearly shows that the parties agreed to a mutual combat without arms or weapons, the question of self-defense being thereby eliminated from the case.

3. **Same—Charge—Matter of Fact and Not of Law—Harmless Error.**—On a trial for murder, where the evidence showed an agreement for a mutual combat without weapons, and that defendant seized a large stick and slew his adversary; and the court, in effect, instructed the jury, that if "one party take an undue advantage of the other and kill him with a deadly weapon, such killing will ordinarily be murder on the part of the slayer," *Held*, erroneous, because whether such killing is murder or manslaughter is not matter of law, but depends upon the facts, and is to be solved by the jury from the facts.   But *held*, further, that such error becomes harmless, and is cured by subsequent portions of the charge which properly applied the law to the facts, and especially so where defendant could not have been injured by said charge, because he was convicted of manslaughter and not murder.

4. **Same—Self-Defense—Retreat.**—On a trial for murder, it is not error for the court to refuse to charge upon self-defense and the law of retreat where the evidence does not raise these issues.

APPEAL from the District Court of Robertson.    Tried below before Hon. JOHN N. HENDERSON.

On trial under an indictment charging him with the murder of one R. N. Moody, appellant was convicted of manslaughter, his punishment being assessed at two years' imprisonment in the penitentiary.

The facts of the case will be fully understood from the testimony of the witnesses George Williams and Sam Hay, which testimony was fully corroborated by the other witnesses.

George Williams, for the State, testified:   "I know the defendant, J. T. Foreman [points him out].   I knew the deceased, R. N. Moody, in his life-time; he is now dead.   I was present when the difficulty between the defendant and deceased occurred, in Robertson County, Texas, on the 5th of September, 1893.   They were both renters on a piece of land then under the control of H. B. Easterwood, a merchant

at Hearne, Texas.  The defendant and deceased cultivated land in the same inclosure.  They cultivated different pieces of land, but had no cross-fence between them.  The land cultivated by defendant and deceased was in the early part of the year 1893 rented by me, as manager for H. B. Easterwood, to defendant and his son Jake Foreman, and Jake Foreman rented his portion of land to the deceased.  There was bad feeling between defendant and deceased for two months previous to the difficulty.  They first fell out about an old crib that was situated on the portion of the land cultivated by the deceased.  Both came to me to know who had a right to use it.  I told them I thought defendant had a right to use it.  On the morning of the difficulty the deceased came to me in Hearne and told me that he had heard that defendant was going to have his stepdaughter arrested on a charge of abusing his (defendant's) mare, and he (deceased) wanted me to go and try to settle the matter; that if Foreman (defendant) had his stepdaughter arrested it would cause trouble.  I went with him, and when we got to Mr. J. V. Burts' place, about four miles from Hearne, we stopped at his well to get water.  While we were there talking to Mr. Burts the defendant rode up and stopped, and said 'good morning' to me, and then looked at Moody and puckered his mouth and then said, 'I am on my way to town (meaning Hearne); I am going to see if I can not have something done for abusing my stock.'  Deceased said, 'If you are going to town to make an affidavit against my daughter you had better not do it.'  Defendant said, further, that the family of deceased had abused his stock, and he could prove it by good witnesses.  Deceased said, 'You can prove anything by your damned folks.'  Defendant then said, 'You are a damned liar.'  Deceased then said, 'I'll teach you how to call me a damned liar.'  I told him that if he was going to fight to give me his gun, and he gave up his gun, threw his hat on the ground, pulled off his coat and rolled up his sleeves, and said, 'Get down and we will settle it right now.'  Mr. Burts said, 'You can't fight here; there are ladies in the house.  If you want to fight get away from here.'  They stopped, but after a little while commenced quarrelling again, and deceased picked up his gun; and Mr. Burts told them they could not fight there; that if they were going to fight to go off in the woods to fight.  I told deceased that if they were going off to fight to give me his gun, which he did, and the defendant started down the road, the deceased starting a little first and the defendant after him on his horse.  The defendant rode up and passed the deceased, until the deceased was about even with the left hip of defendant's horse.  They went on down the road quarrelling until they reached the Hearne road, at the corner of the fence, about 100 yards from where they started at the well.  Defendant turned to the right on the Hearne road, which threw him a little ahead of deceased, the deceased being to the left of defendant.  Deceased here said, 'This

is as good a place as any; get down and we will settle it;' and defendant stopped his horse, jumped off on the right side, picked up a stick, passed around in front of his horse and under his neck, and struck the deceased, knocked him down, and struck him twice more on the head. I was about twenty-five yards behind and hallooed to defendant to stop, that he would kill the deceased; and defendant stopped striking him then, jumped on his horse with his stick in his hand, and rode rapidly away in the direction of Hearne. I went to the deceased, who was trying to get up, helped him to arise, and told Sam Cooper, a negro, to help him, and deceased walked back to the well, distant about 100 yards, got on his mule, and rode home, about one-fourth of a mile. I did not go all the way with him, because I stopped to open and close the gate, and deceased rode on to his house, hitched his mule, and went in. I went into the house and found deceased lying down. He had three wounds on his head. He asked me to go after a doctor, which I did. I got Dr. Erwin, from Hearne, to go and see deceased. Deceased died about 5 or 6 o'clock in the evening from the effects of the wounds. This occurred in Robertson County, Texas, on the 5th of September, 1893. Deceased told me that morning that defendant had threatened to prosecute his stepdaughter on a charge of abusing and injuring one of his (defendant's) horses, and he further said, that if he did it there would be trouble. Deceased said he belonged to the 'honest men's club,' and that he would bring the boys together and they would just give defendant fifteen days in which to leave the county."

Re-examined: "When deceased proposed to fight in front of Burts' the defendant did not say anything. He did not agree to fight the deceased. He pulled off his coat and hat and rolled up his sleeves, and it looked as if they were about to fight, and Burts told them they should not fight in front of his house; to go down in the woods if they wanted to fight. He told them this the second time, as they kept quarelling, and then both of the parties started off in the direction of the woods about the same time, the deceased on foot and the defendant on horseback. In going to the woods the deceased started a little in advance, but the defendant caught up and 'kinder' passed him. When defendant got opposite the brush pile, near the corner of the fence, he checked up his horse; deceased, who was on the left side of the horse, stepped back, rolled up his sleeves, and said, 'I reckon this is as good a place as any.' In the meantime defendant slid or got off his horse on the opposite side of deceased, picked up the stick, and then rapidly passed under the horse's neck and came down on the head of deceased with the stick, which he held in both hands. This occurred very rapidly. Deceased raised and extended his arms and hands as the lick was coming down. I did not start off when defendant and deceased started, but after they had got a little piece I started, thinking I would prevent

the fight or part them. Granville Osborn, the little stepson of deceased, started with me, and was near me when defendant lit from his horse and struck deceased. Sam Cooper was also following; he was probably about thirty yards behind me. Mr. Burts was also there; he may have started from the front of his house."

Recross-examined: "I went after the doctor to Hearne, and when I started back met defendant coming into town. He said he was going to give himself up; he said he was sorry he had hurt deceased. His bond was fixed at $100; that was before it was known that the wounds of deceased were fatal. Deceased had no weapons or anything in his hands when he was struck by defendant. He was extending his hands from him and upwards, as if to ward off the blow, when he was struck."

Sam Hay testified for the State: "I met defendant in the road near where the difficulty occurred. He was riding in the direction of my house and had a stick in his hand. It was a postoak stick about three feet long, two and one-half inches at the large end, and one and three-fourth inches at the small end; it was part of a bush that had been cut down with an axe; the brush end had been burned off in a brush heap; it was a heavy seasoned stick, and had knots on it. Defendant was very much excited when I met him; said he wanted my gun; said Mr. Moody and Williams were after him to kill him."

Cross-examined by defendant: "Defendant seemed to be very much frightened when I met him; said, 'They are after me to kill me;' said, 'Moody and Williams are trying to kill me.' I was looking for the difficulty. Moody was threatening to whip defendant. Deceased showed me a large spring-backed Barlow knife, and said he was going to whip defendant or cut him to pieces before the end of the year. He said defendant was to keep the stock out of the field but did not do so. Said defendant's horse had been staked in the field and got loose, dragging the stake-rope. Defendant did all he could to keep the stock out of the field. I have heard him three times at night after stock in the field while deceased was at home asleep. I know it was the defendant I heard after the stock at night. I know his voice. When he asked me for my gun he said he only wanted to defend himself; that Moody had a gun. He seemed to think that Mr. Williams was taking the part of Mr. Moody. Williams was H. B. Easterwood's overseer on the farm."

Re-examined: "I knew from the parties that it was defendant's business to keep stock out of the field. The deceased claimed damages on account of stock. Deceased claimed that defendant staked his horse or mule on his (defendant's) part of the field, and that they would pull up the stake and run over his (deceased's) cotton and knock it out, and he wanted defendant to pay him for it. Defendant would

not agree to do it, and both parties were mad, and I expected a difficulty. I never heard defendant make any threats."

*O. D. Cannon,* for appellant.—1. The court erred in charging on mutual combat, and especially was said charge, in so far as it instructed upon a mutual combat with deadly weapons, erroneous; because there was no evidence on the trial of any agreement to fight or to enter into a mutual combat, but positive testimony that defendant never did agree to fight with deadly weapons or even with hands and fists. Bell v. The State, 17 Texas Crim. App., 538.

2. The court erred in failing and refusing to charge the jury on the law of self-defense, on the law of aggravated assault, and the law of simple assault.

On assaults: Penal Code, art. 614; Dones v. The State, 8 Texas Crim. App., 112; Hill v. The State, 11 Texas Crim. App., 456; Bell v. The State, 17 Texas Crim. App., 538; Penal Code, arts. 484, 496.

On self-defense: Penal Code, arts. 572, 573; Bell v. The State, 17 Texas Crim. App., 538; Penal Code, arts. 80, 81; Kendall v. The State, 8 Texas Crim. App., 569.

3. The court erred in its charge to the jury in charging the law of murder in its first and second degree, and manslaughter. There is no evidence in the statement of facts that justifies a charge on murder, and said charge tended to aggravate the cause in the minds of the jury. Bell v. The State, 17 Texas Crim. App., 538.

In connection with his brief counsel also filed an able and interesting argument on the facts of the case, which is too lengthy to be reproduced.

*R. L. Henry,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Application for continuance was made for the testimony of three absent witnesses, by whom appellant expected to prove communicated threats made by deceased to whip him, "if he had to kill him in doing so." One of the witnesses appeared during the trial, but was not called on to testify. Why this was not done is not explained. The combat being a mutual one, this testimony was not material in this case. Deceased proposed to appellant to retire to the "woods" and settle their grievances. The defendant accompanied him to the designated place, seized a large stick, and with it slew his adversary. The deceased was unarmed, having left his gun at the house. The evidence clearly discloses that the combat was to have been without arms or weapons. This being the case, self-defense was eliminated from the case, and in view of the fact that the conviction was for manslaughter, with the minimum punishment assessed, we are un-

able to appreciate any bearing this evidence could have had upon the case favorable to the defendant.   Pruitt v. The State, 30 Texas Crim. App., 156.

But if the evidence was material, it could have been shown by the witness attending the trial.   Not only so, but threats made by deceased were in fact proved on the trial.   These were not denied or contradicted by the State, nor were they a disputed issue on the trial.   There was no error in refusing the application.   The new trial on this ground was properly refused.

The court instructed the jury:   "Where the parties engage in mutual combat and fight together willingly with deadly weapons in a manner calculated to cause the death of both or either, the killing, should it occur, will ordinarily be murder on the part of the slayer; and where parties agree to fight in mutual combat with their hands and fists, in which no deadly weapons are to be used, and one party take an undue advantage of the other, and kill him with a deadly weapon, such killing will ordinarily be murder on the part of the slayer."   Exception was reserved to the charge.   Appellant was acquitted of murder.   This charge was upon the effect of evidence, and states that effect to be a rule of law in ordinary cases.   Whether such killing is murder in either degree or manslaughter must depend upon the facts attendant upon the case on trial.   It is not matter of law in either case.   The condition of the mind, in such state of case, is not fixed by law, but must be ascertained from the facts adduced in evidence.   Whether the killing occurs in mutual combat or otherwise, the nature, character, and degree of such homicide will depend upon the condition of the mind of the slayer; and this must be ascertained from the circumstances of the particular case.   This condition of the mind, whether cool and sedate, or inflamed and excited, or aroused to such sudden passion as to render it incapable of cool reflection, induced thereto by an adequate cause, is not to be determined by the law as matter of law, but is to be solved from the facts by the jury.   These were general remarks by the court.   Following these remarks the court properly applied the law to the facts of the case.   Was it possible for the remarks of the court to have injured appellant?   That they did not affect the jury is evident, because manslaughter, and not murder, was the offense found, and no honest jury could have acquitted or found less than manslaughter under the circumstances of this case. Self-defense and the law of retreat are not issues in this case under the evidence before us.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.